IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

AHMED MOHAMED, *et al.*,
  Plaintiffs,

v.                                                      Civil No. 1:23cv1448 (DJN)

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et al.*,
  Defendants.

## MEMORANDUM OPINION

This action, brought pursuant to the Administrative Procedures Act, 5 U.S.C. § 702 *et seq.* ("APA"), comes before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 25, 27.) Plaintiffs Ahmed Mohamed ("Mohamed") and Yuliya Smirnova ("Smirnova") argue that Defendant United States Citizenship and Immigration Services ("USCIS") acted arbitrarily and capriciously when it denied Smirnova's I-130 Petition for Alien Relative on behalf of Mohamed. (ECF No. 25 ("Pls.' Mot.") at 24.) Specifically, Plaintiffs assert that USCIS failed to identify the substantial and probative evidence required under 8 U.S.C. § 1154(c) to prove that Mohamed's prior marriage to Kaira Marie Henderson ("Henderson") qualified as fraudulent. (*Id.* at 8–19.) Plaintiffs also contend that USCIS applied the wrong standard of proof when reviewing Smirnova's rebuttal evidence, including affidavits in which Mohamed and Henderson retracted their earlier admissions of marriage fraud. (*Id.* at 19–23.)

Defendants counter that USCIS reasonably concluded that substantial and probative evidence supported the finding of a fraudulent marriage between Henderson and Mohamed, and that Henderson's and Mohamed's recantations of their earlier admissions concerning the

marriage were considered but given little to no evidentiary weight. (ECF No. 28 ("Defs.' Mem.") at 16–26.)  Defendants contend that USCIS also applied the proper standard of proof in reviewing Plaintiffs' rebuttal evidence, and that even if the wrong standard was applied, any resulting error was harmless. (*Id.* at 25.)

For the following reasons, the Court will DENY Plaintiffs' Motion for Summary Judgment (ECF No. 25) and GRANT Defendants' Motion for Summary Judgment (ECF No. 27).

## I.       BACKGROUND

The following facts from the parties' briefs and the certified administrative record[1] stand undisputed unless otherwise indicated.

Mohamed, an Egyptian citizen, was admitted to the United States on May 12, 2002. (R. at 87, 112–13, 800.)  On December 4, 2003, he married Kaira Marie Henderson ("Henderson"), a United States citizen, in the State of Maryland. (R. at 860.)  On January 15, 2004, Henderson filed a Form I-130 Petition for Alien Relative (the "Henderson petition") on Mohamed's behalf. (R. at 854–82.)  Henderson attached documents bearing both Mohamed and Henderson's names, including a marriage certificate (R. at 860), a residential lease (R. at 864–66), a cable bill (R. at 872–75) and a voided check (R. at 863).  Around the same time, Mohamed filed a Form I-485 Application to Register Permanent Residence (the "first I-485 Application"), seeking to become a permanent resident of the United States. (R. at 783–86.)  On both the Henderson petition and the first I-485 Application, Mohamed and Henderson identified their address as 300 Robin Drive, Apartment 305, Ocean City, Maryland 21842. (R. at 783, 854, 864.)

---

[1]      The Court uses the abbreviation "R." and the corresponding pagination when citing to documents contained within the certified administrative record.  Due to the size of the record and limitations with the Court's Electronic Case Filing ("ECF") System, the administrative record has been submitted across several ECF filings. (ECF Nos. 21–22.)

USCIS interviewed both Henderson and Mohamed as part of his first I-485 Application on or about April 14, 2004. (R. at 62, 64.) USCIS Officer Peggy Lin, who conducted the interview, memorialized her observations in a report that same day. (R. at 51.) Officer Lin suspected a sham marriage and recommended an on-site investigation to determine if Henderson and Mohamed had entered a bona fide marriage. (R. at 51.) Specifically, Officer Lin noted Henderson's "strange behavior," as she played games on her phone and seemed "totally unconcerned" during Mohamed's interview. (R. at 51.) Officer Lin also noted that Henderson stated that she lived in Apartment 304 despite the forms listing their address as Apartment 305. (R. at 51.) Further, Officer Lin suspected that Mohamed and Henderson were "introduced/arranged" at their place of employment, Ledo's Pizza, by the owner, who was Mohamed's friend, and Henderson's aunt. (R. at 51.) Lastly, Officer Lin noted that Henderson had been "unemployed for almost four years" until she started working at Ledo's, and that Henderson and Mohamed's relationship, from first meeting through marriage and the filing of the Henderson petition, developed rapidly. (R. at 51.)

In a later affidavit, Mohamed stated that Henderson "came around less often" between April 2004 and the end of 2004, and "it became clear that neither of [them] had the energy to pursue [their] marriage." (R. at 291.) He further stated that they did not formally separate and remained friends. (R. at 291.) On or about January 7, 2005, Mohamed submitted an Alien's Change of Address Card reflecting his new address as 155 Jamestown Road, Apartment 202, Ocean City, Maryland 21842. (R. at 794.)

On or about June 1, 2005, United States Immigration and Customs Enforcement ("ICE") began investigating the Henderson–Mohamed marriage and spoke with officers of the Fruitland Police Department who were "very familiar with Henderson" and "were not aware of her having

3

a husband of Egyptian heritage." (R. at 56.) According to Fruitland officers, Henderson resided with her sister at 219 Morris Street, Fruitland, Maryland 21826 and bore a child with another man. (R. at 57.)

On June 2, 2005, ICE and Fruitland officers visited Henderson at 219 Morris Street. (R. at 57–58.) According to a written report prepared by ICE ("the ICE report"), Henderson answered the door, stated that there was another man in the house and spoke with officers on the front step. (R. at 58.) The report states that Henderson "claims the sole reason for marrying [Mohamed] was out of friendship" and stated that "she was not in love with [Mohamed], and only married him because he needed a United States wife so he could get insurance benefits and a social security card." (R. at 58.) The ICE report also states that Henderson denied that she and Mohamed ever consummated the marriage, noting that a single encounter "was the extent of their sexual relationship." (R. 58–59.) Henderson reported that she and Mohamed never lived together, and she "agreed to withdraw the [Henderson] petition." (R. at 59.)

That same morning, ICE officers visited Mohamed at his new address at 155 Jamestown Road. (R. at 59.) Mohamed let the officers into his apartment where they noticed one woman in his bedroom and two other women sleeping on a pullout couch. (R. at 60.) According to the ICE report, Mohamed claimed to have given Henderson "five hundred dollars on several occasions" and stated that they "never entered into the marriage because they were in 'love.'" (R. at 61.) Mohamed then reportedly stated that "he knew what he had done [was] wrong, but he desperately want[ed] to live in the United States legally." (R. at 61.) Following these interviews and its investigation, ICE later concluded that Mohamed and Henderson "entered into the marriage . . . solely to gain benefits from the Service." (R. at 410.) Mohamed filed for divorce

4

from Henderson on August 8, 2005, and the divorce became final on May 11, 2006. (R. at 573, 753–55.)

Mohamed signed and dated a sworn statement (the "2010 Mohamed statement") before USCIS's Fraud Detection and National Security Directorate ("FDNS") on March 9, 2010. (R. at 2–6, 375–76.) Mohamed also certified "under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct" and swore and affirmed that he had "read and fully [understood] the questions and answers in [his] sworn statement." (R. at 6, 376.) In the sworn statement, Mohamed provided the following answers to the following questions and signed his initials next to each of those answers:

> Q:  Was your marriage to Kaira Marie Henderson for the sole purpose of obtaining immigration benefits?
> A: Yes.
>
> Q:  Did you pay Kaira Marie Henderson any money and/or promise her anything in return for the fraudulent marriage?
> A:  Money yes but I did not promise her anything.  Whenever she needed money for rent and shopping.
>
> Q:  Have you and Kaira Marie Henderson ever resided together?
> A:  We only resided one day.
>
> Q:  Was your alleged marriage with Kaira Marie Henderson ever consummated?
> A:  No.

(R. at 5, 375.) On March 16, 2010, USCIS denied the Henderson petition after determining that Mohamed's and Henderson's marital relationship no longer legally existed due to their divorce and that they had entered into a sham marriage based on their statements to ICE in 2005 and Mohamed's sworn statement to FDNS in 2010. (R. at 36–39, 848–51.) USCIS also denied Mohamed's first I-485 Application that same day. (R. at 783.)

On May 6, 2013, Mohamed married Smirnova. (R. at 435, 572.) Smirnova then filed an I-130 Petition (the "first Smirnova petition") on Mohamed's behalf on December 6, 2013. (R. at

567–69.) Mohamed additionally filed another Form I-485 (the "second I-485 Application") seeking permanent resident status. (R. at 507–16.) Mohamed spoke with USCIS on December 23, 2015, during an interview as part of his second I-485 Application. (R. at 377–78, 557–58, 577–78.) In that statement, Mohamed claimed that, back when he met with officers at his apartment in 2005, he was "assisting the ICE office in Ocean City" in arresting an individual who was arranging marriages and was told by ICE that they were "going to help [him]." (R. at 378, 557–58, 578.) Mohamed also stated that, without reading its contents, he signed the 2010 Mohamed statement, in which he stated that he married Henderson to obtain immigration benefits, because the officers told him they were going to help him for "the work that [he] was doing with them." (R. at 378, 557–58, 578.)

One month later, on January 21, 2016, USCIS issued a Notice of Intent to Deny ("NOID"), advising Smirnova of its intent to deny the first Smirnova petition, because Mohamed had previously engaged in marriage fraud as prohibited under 8 U.S.C. § 1154(c). (R. at 554–66.) On August 22, 2016, USCIS denied the first Smirnova petition and Mohamed's second I-485 Application. (R. at 501–07, 538–43, 567.) Smirnova filed a Motion to Reopen the first Smirnova petition with attached affidavits from Mohamed and Henderson, who both claimed that they did not enter a fraudulent marriage. (R. at 459–500.) USCIS denied the Motion to Reopen on January 11, 2017, due to procedural deficiencies. (R. at 455–58.)

Smirnova then filed another I-130 Petition (the "second Smirnova petition") on behalf of Mohamed on July 26, 2019. (R. at 416–33.) Smirnova later submitted an October 2, 2020 affidavit from Henderson that reinforced Henderson's affidavit submitted with the 2016 Motion to Reopen. (R. at 302.) Smirnova also included an October 7, 2020 sworn statement that Mohamed gave to USCIS, in which he stated that he married Henderson for love and that he

believed that his 2010 sworn statement to FDNS related to his assistance in an ICE marriage fraud operation. (R. at 104–07.) On May 7, 2021, USCIS issued a NOID for the second Smirnova petition, again due to its determination of a fraudulent marriage between Henderson and Mohamed. (R. at 411–15.) On July 7, 2021, Smirnova responded to the NOID. (R. at 383–410.) USCIS interviewed Mohamed on October 25, 2021, and he again asserted that he did not fraudulently marry Henderson. (R. at 10.) Then, on November 9, 2021, USCIS issued a second NOID, (R. at 293–300, 359–66), to which Smirnova responded on February 4, 2022, (R. 284–90). Smirnova included yet another sworn statement from Mohamed, in which he contended that he and Henderson did not enter a fraudulent marriage. (R. at 291.)

USCIS denied the second Smirnova petition on August 8, 2022, stating that Smirnova had failed to rebut the substantial and probative evidence concerning Mohamed's and Henderson's fraudulent marriage. (R. at 272–83, 416.) Plaintiffs now seek review of this USCIS decision. Plaintiffs filed suit on October 24, 2023, seeking declaratory and injunctive relief.[2] (ECF No. 1.) On May 29, 2024, Plaintiffs filed their Motion for Summary Judgment. (ECF No. 25.) Defendants filed their Motion for Summary Judgment on June 27, 2024. (ECF No. 27.) The cross-motions have been fully briefed and stand ripe for review.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment qualifies as appropriate only if the record shows that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d

---

[2]    The Complaint also included two counts under the Freedom of Information Act ("FOIA"). 5 U.S.C. § 551-59. However, the parties stipulated to the dismissal of the FOIA claims. (ECF No. 23.)

954, 958–59 (4th Cir. 1996). The party seeking summary judgment has the burden to identify

the parts of the record indicating an absence of a genuine issue of material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323–25 (1986). A genuine issue of material fact exists "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S.

at 248.

This case involves a final action by USCIS, which stands subject to judicial review under

the APA.[3] 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof."). "A court conducting judicial review under the APA does

not resolve factual questions, but instead determines 'whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did.'" *Friends*

*of Back Bay v. U.S. Army Corps of Eng'rs*, 2011 WL 12473234, at *4 (E.D. Va. Feb. 9, 2011)

(citations omitted). Thus, "in a case involving review of a final agency action under the APA . . .

the standard set forth in Rule 56[(a)] does not apply because of the limited role of the court in

reviewing the administrative record." *Id.* Rather, "summary judgment becomes the 'mechanism

for deciding, as a matter of law, whether the agency action is supported by the administrative

record and otherwise consistent with the APA standard of review.'" *Id.* (citation omitted). Thus,

judicial review stands confined to review of the administrative record from proceedings before

---

[3]     The law governing the exhaustion of APA claims differs from that governing exhaustion
in other contexts. The APA only requires a plaintiff to exhaust those administrative remedies
mandated by a statute or agency rule. 5 U.S.C. § 704. Plaintiffs, therefore, are not required to
exhaust optional intra-agency appeals before filing suit in federal court. *See Darby v. Cisneros*,
509 U.S. 137, 147 (1993) ("[I]t would be inconsistent with the plain language of [5 U.S.C.
§ 704] for courts to require litigants to exhaust optional appeals as well."). Here, Plaintiffs had
the option to appeal USCIS's decision to the Board of Immigration Appeals ("BIA") but had no
obligation to do so. Thus, this appeal stands properly before the Court on direct appeal from
USCIS's decision denying the I-130 petition.

the agency, "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  The standard of review qualifies as extremely "narrow" and a court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Indeed, judicial review under the APA is "highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Accordingly, the reviewing court stands limited to examining "whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment." *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 263 (4th Cir. 2006).  "The agency action will stand if the record reveals a rational basis for the decision." *Oddo v. Reno*, 175 F.3d 1015, 1999 WL 170173, at *2 (4th Cir. 1999) (citing *Trinity Am. Corp. v. EPA*, 150 F.3d 389, 395 (4th Cir. 1998)).  Courts "must ensure, among other things, that the agency has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024).  An agency such as USCIS "abuses its discretion if it fails to offer a reasoned explanation for its decision, or distorts or disregards important aspects of the applicant's claim." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc).

A reviewing court may set aside any of an agency's dispositive factual findings unsupported by "substantial evidence." *Chao v. Sessions*, 698 F. App'x 751, 752 (4th Cir. 2017) (citing 5 U.S.C. § 706(2)(E)).  "[T]he threshold for such evidentiary sufficiency is not high" and

requires only "such relevant evidence as a reasonable mind might accept as adequate to support" the agency's conclusion. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (citation omitted). In the Fourth Circuit, the "substantial evidence" test "mandates affirmance" unless "no reasonable factfinder could agree" with the agency's factual conclusions. *Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 354 (4th Cir. 2006) (internal quotation omitted). Thus, agency decisions "within a zone of reasonableness" must be upheld. *Mestanek v. Jaddou*, 93 F.4th 164, 170 (4th Cir. 2024) (quoting *Ren v. USCIS*, 60 F.4th 89, 93 (4th Cir. 2023)).

### III.   ANALYSIS

Before addressing the merits of each argument, the Court sets out the statutory and regulatory framework governing the adjudication of an I-130 petition brought by a United States citizen on behalf of a beneficiary alien spouse. To legally immigrate to the United States, an alien must obtain a visa in some form. *See generally* 8 U.S.C. §§ 1151–54. One option allows a United States citizen to file an I-130 petition with USCIS, requesting that the agency classify a non-citizen spouse as his or her "immediate relative." *See id.* §§ 1151(b)(2)(A)(i), 1154(a); 8 C.F.R. § 204.1(a)(1). "The burden is on the petitioner to establish eligibility for the benefits sought." *Matter of Phillis*, 15 I. & N. Dec. 385, 386 (B.I.A. 1975). The citizen-spouse must submit sufficient evidence with an I-130 petition to prove "the claimed relationship of the petitioner to the beneficiary." 8 C.F.R. § 204.1(f)(1). USCIS then must conduct "an investigation of the facts in each case" to determine whether to grant the I-130 petition. 8 U.S.C. § 1154(b). If USCIS "determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative," then the Attorney General "shall . . . approve the petition." *Id.* Conversely, USCIS must deny an I-130 petition if it determines that the alien beneficiary has at any time "entered into" or "attempted or conspired to enter into a

10

marriage for the purpose of evading the immigration laws," regardless of the legitimacy of the beneficiary's current marriage. *Id.* § 1154(c). Specifically, regulations require application of the "fraudulent marriage prohibition" when there exists "substantial and probative evidence" of an attempt to evade immigration laws through a sham marriage. 8 C.F.R. § 204.2(a)(1)(ii).

While conducting its investigation, USCIS "may rely on any relevant evidence, including evidence having its origin in prior [USCIS] proceedings involving the beneficiary." *Matter of Tawfik*, 20 I. & N. Dec. 166, 168 (B.I.A. 1990). "Ordinarily, [USCIS] should not give conclusive effect to determinations made in a prior proceeding, but, rather, should reach [its] own independent conclusion based on the evidence before [it]." *Id.* "Although it is not necessary that the alien have been convicted of, or even prosecuted for the attempt or conspiracy, the evidence of the attempt or conspiracy must be contained in the alien's file." 8 C.F.R. § 204.2(a)(1)(ii). "The conduct of the parties after marriage is relevant to their intent at the time of marriage. . . . Where the parties have never lived together, the amount of evidence required to establish that the marriage was not entered into for the fraudulent purpose of evading the immigration laws may be considerable." *Matter of Phillis*, 15 I. & N. Dec. at 387.

If USCIS finds evidence of marriage fraud, it must issue the petitioner a written Notice of Intent to Deny ("NOID"), which must "specify the type of evidence required, and whether initial evidence or additional evidence is required, or the bases for the proposed denial sufficient to give the applicant or petitioner adequate notice and sufficient information to respond." 8 C.F.R. § 103.2(b)(8)(iv). The NOID also must advise the petitioner of "derogatory information considered . . . of which the applicant or petitioner is unaware." *Id.* § 103.2(b)(16)(i). However, regulations do not "require USCIS to provide documentary evidence of the [derogatory] information, but only sufficient information to allow the petitioners to rebut the allegations."

11

*Owusu-Boakye v. Barr*, 376 F. Supp. 3d 663, 675 (E.D. Va. 2019) (quoting *Mangwiro v. Johnson*, 554 F. App'x 255, 261 (5th Cir. 2014)).  Courts have concluded that USCIS satisfies this obligation by "summariz[ing] the contents" of evidence probative of marriage fraud within a NOID.  *Id.* (collecting cases).

The petitioner then receives an "opportunity to rebut the information and present information in his/her own behalf before the decision is rendered."  8 C.F.R. § 103.2(b)(16)(i).  "Because the petitioner bears the ultimate burden of proving the beneficiary's eligibility, the petitioner 'must therefore rebut any evidence of marriage fraud in the alien's file with proof that the prior marriage was bona fide, *i.e.*, not fraudulent.'"  *Armah-El-Aziz v. Zanotti*, 2015 WL 4394576, at *5 (E.D. Va. July 16, 2015) (quoting *Bourisquot v. Holder*, 569 F. App'x 35, 36 (2d Cir. 2014)).  After receiving the petitioner's evidence, USCIS then decides whether to approve or deny the petition.  8 C.F.R. § 204.2(a)(1)(ii).  A petitioner can appeal a USCIS denial of an I-130 petition directly to federal court without first appealing to the BIA.  5 U.S.C. § 704.

Having established the statutory and regulatory framework, the Court next analyzes the merits of Plaintiffs' arguments.  For the following reasons, the Court finds that USCIS's denial of the second Smirnova petition was supported by substantial and probative evidence, and therefore, the agency's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Further, the Court finds that USCIS did not apply an improper standard of proof when considering Plaintiffs' rebuttal evidence.  Accordingly, judgment will be entered in Defendants' favor.

### A.   Substantial and Probative Evidence of Fraudulent Marriage

The government bears the initial burden of proving marriage fraud.  *Zerezghi v. USCIS*, 955 F.3d 802, 805 (9th Cir. 2020) (citing *Matter of Kahy*, 19 I. & N. Dec. 803, 806–07 (B.I.A.

1988)).  USCIS can meet this burden with "documents in its possession, interviews with the couple, and observations made during site visits to the couple's marital residence." *Id.* (citing *Matter of Singh*, 27 I. & N. Dec. 598, 600–01 (B.I.A. 2019)).  To demonstrate substantial and probative evidence of marriage fraud, "the evidence must establish that it is more than probably true that the marriage is fraudulent." *Matter of Singh*, 27 I. & N. Dec. at 607.  Thus, the required degree of proof constitutes "more than a preponderance of evidence, but less than clear and convincing evidence." *Id.* at 598.  The "quality and quantity" of the evidence must be "competent, credible and objective," and both direct and circumstantial evidence may be considered. *Id.* at 606, 608.  Inferences, no matter how reasonable, do not constitute substantial and probative evidence. *Matter of Tawfik*, 20 I. & N. Dec. 166, 168 (B.I.A. 1990).  In particular, any determination of marriage fraud "shall not be based on negative inferences." *In re Azzab*, 2007 WL 3301607, at *2 (B.I.A. Sept. 28, 2007).  Ultimately, the agency should focus on whether the couple "intended to establish a life together at the time they were married." *Owusu-Boakye v. Barr*, 376 F. Supp. 3d 663, 676 n.3 (E.D. Va. 2019) (quoting *Matter of Laureano*, 19 I. & N. Dec. 1, 2–3 (B.I.A. 1983)).

In their Motion for Summary Judgment, Plaintiffs argue first that Defendants failed to identify the substantial and probative evidence required under 8 U.S.C. § 1154(c) to shift the burden of proving the bona fides of Mohamed's prior marriage to Henderson. (Pls.' Mot. at 8–19.)  Specifically, Plaintiffs focus on two documents that USCIS relied on in its NOID of the second Smirnova petition:  (1) the 2005 ICE report and (2) the 2010 Mohamed statement. (Pls.' Mot. at 14.)  Plaintiffs contend that the 2005 ICE report fails to constitute sufficient substantial and probative evidence of marriage fraud, because it "contains conclusory statements with no supporting evidence" and because Mohamed and Henderson have consistently denied the

13

assertions contained in that report. (*Id.*) Plaintiffs also argue that there exists no written statement from Henderson stating that she and Mohamed engaged in a sham marriage. (*Id.*) Plaintiffs note that Henderson stated in her 2016 and 2020 affidavits that she felt "bullied" and intimidated by the ICE officers and pressured to withdraw the Henderson petition. (*Id.* at 15.) Plaintiffs argue that the ICE report does not constitute a sworn statement signed by either Henderson or Mohamed, but rather constitutes a "characterization of the author's interpretation of what was allegedly said." (*Id.* at 17–18.) Plaintiffs also argue that the ICE report constitutes double hearsay since it stands as a summary containing Mohamed's and Henderson's statements. (*Id.* at 18.)

As to the 2010 Mohamed statement, Plaintiffs assert that Mohamed has disavowed the document, because he was misled as to its purpose and did not read it before signing it. (*Id.* at 15.) Plaintiffs highlight Mohamed's later affidavit, in which he details how he came to meet Henderson and states that they lived apart to save money and find a larger home. (*Id.* at 16.) Mohamed also claimed that "[i]t was clear . . . that the agents had already made up their mind as to the bona fides of his marriage." (*Id.*) In his affidavit, Mohamed then asserts that he became an ICE informant to assist with breaking up a marriage-fraud ring and a narcotics trafficking conspiracy, and that he was led to believe that ICE "was going to take care of his immigration status." (*Id.*) Plaintiffs argue that Mohamed did not know that his 2010 meeting was actually a USCIS interview concerning the Henderson petition, but rather believed it to be a briefing for his work as an undercover operative for ICE. (*Id.* at 16–17.) Plaintiffs contend that Mohamed was not placed under oath or advised that he could have counsel present when FDNS advised him to initial and sign the statement, which he did without reading "because he trusted the people at ICE." (*Id.* at 17.) He thought he was withdrawing his application with the expectation of ICE's

14

assistance, but never intended to admit marriage fraud. (*Id.*) Lastly, Plaintiffs argue that USCIS did not give any weight to Henderson's and Mohamed's affidavits, both of which directly contradict the ICE report and their purported admissions. (*Id.* at 18.)

Defendants deny Plaintiffs arguments and assert that the 2005 ICE report and the 2010 Mohamed statement were properly relied upon and constitute substantial and probative evidence of marriage fraud between Henderson and Mohamed. (Defs.' Mem. at 16–24.) Defendants also assert that USCIS considered Henderson's and Mohamed's later statements but ultimately assigned them little to no weight in the context of the other evidence. (*Id.* at 20.)

The Court will first address each of Plaintiffs' concerns with the evidence relied upon by USCIS in its decision to deny the second Smirnova petition, before explaining why it finds that USCIS properly satisfied the substantial and probative evidence standard and therefore did not act arbitrarily and capriciously, or otherwise abuse its discretion.

First, as to Plaintiffs' argument that there exists no written admission of fraud from Henderson, the Court notes that USCIS can satisfy the substantial and probative evidence standard with any relevant evidence, including "documents in its possession, interviews with the couple, and observations made during site visits to the couple's marital residence." *Zerezghi*, 955 F.3d at 805. Statements made "during the normal course of USCIS's investigation" can constitute substantial and probative evidence of fraud. *Bangura v. Whitaker*, 2019 WL 418858, at *2 (E.D. Va. Feb. 1, 2019). Further, spousal admissions of fraud constitute the most relevant examples of substantive and probative evidence. *See, e.g.*, *Mestanek v. Jaddou*, 93 F.4th 164, 173 (4th Cir. 2024) (finding former spouse's admission to be more credible and probative than her later recantation).

Here, Henderson's statements, while not written or signed, were made to ICE officials during interviews related to an ongoing investigation of potential marriage fraud. The record presents no indication that the investigation was improper. *See Bangura*, 2019 WL 418858, at *2 (dismissing Plaintiffs' argument that previous spouse's statement was "false and manufactured unfairly by USCIS officials" when the record indicated the statement was made "during the normal course of USCIS's investigation"). Plaintiffs cite no case law requiring a written statement for a spousal admission to be considered in USCIS's substantial and probative evidence analysis, and the Court will not impose such a requirement here.

For similar reasons, Plaintiffs' argument regarding the ICE report being a "characterization of the author's interpretation of what was allegedly said" must fail. (Pls.' Mot. at 18.) As the Court just addressed, the agency may meet its burden with any relevant evidence to include "interviews with the couple, and observations made during site visits." *Zerezghi*, 955 F.3d at 805. Here, ICE officers visited the respective apartments of Henderson and Mohamed on the morning of June 2, 2005, where they spoke separately with both individuals. (R. at 57–61.) The officers then made contemporaneous notes describing those interviews in the ICE report. (R. at 57–61.) As the Fourth Circuit recently noted, "public officials enjoy a 'presumption of regularity' in the performance of their official duties." *Mestanek*, 93 F.4th at 172 (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1368 (4th Cir. 1975)). The Court finds no reason to rebut that presumption here or to cast doubt on any of the officers' summaries of Henderson's and Mohamed's responses contained within the ICE report. *See Ogbolumani v. Napolitano*, 557 F.3d 729, 734 (7th Cir. 2009) ("While sworn statements would have bolstered USCIS's case, they are not . . . required.").

16

Henderson's later assertions that she felt "bullied and pressured to withdraw the petition" and "intimidated by the immigration agents" also do not present an issue warranting a reversal of USCIS's denial of the second Smirnova petition. (R. at 479–80.) In *Mestanek v. Jaddou*, the Fourth Circuit affirmed the district court's dismissal of a petitioner's challenge to USCIS's denial of her Form I-130 petition. 94 F.4th at 166. In that case, the former spouse sought to retract her confession, contending that agents threatened her with jail time if she did not write and sign the statement. *Id.* at 169. The Fourth Circuit agreed with the lower court in finding that USCIS's decision was supported by substantial and probative evidence and that the spouse's allegations of coercion and threatened jail time did not rebut that evidence. *Id.* at 174.

Here, Plaintiffs argue that Henderson felt "bullied" and "intimidated," but the record otherwise reveals no indications of threats or coercion at the time of the ICE site visit with Henderson. As courts have held, a "generalized claim of duress, by itself, is insufficient to compel a different result." *Rojas v. Secretary, DHS*, 675 F. App'x 950, 955 (11th Cir. 2017) (citing *Matter of Isber*, 20 I. & N. Dec. 676, 679 (B.I.A. 1993)). Further, had Henderson faced coercion or threats, "she likely would have mentioned it sooner." *Gyau v. Whitaker*, 2019 WL 1063372, at *3 (E.D. Va. Mar. 6, 2019) (upholding USCIS's denial of an I-130 petition despite spouse's later recantation of her confession when petitioners presented no "corroborating evidence of coercion"). For these reasons, Henderson's generalized claims of intimidation do not suggest that the agency abused its discretion in denying the second Smirnova petition.

The Court next turns to Plaintiffs' argument that the ICE report constitutes double hearsay as a summary containing statements.[4] (Pls.' Mot. at 18.) "[T]he Federal Rules of

---

[4]      In their Reply, Defendants assert that the ICE report does not constitute hearsay. (ECF No. 33 at 6 n.2.) For the sake of analysis, the Court here assumes that the report constitutes hearsay and will not address Defendants' argument to the contrary.

Evidence do not apply in immigration hearings, which means that hearsay evidence is admissible." *Djadjou v. Holder*, 662 F.3d 265, 276 (4th Cir. 2011). However, courts prohibit hearsay evidence when it stands "so highly unreliable as to render a proceeding fundamentally unfair." *Id.* at 277. In *Djadjou v. Holder*, the Fourth Circuit held that the agency properly discredited hearsay statements from "officials in Cameroon who conveyed information they observed in records that were supposedly accurate." *Id.* The proponents of the statements did not review the records "personally to ascertain their accuracy or trustworthiness," did not include information about the Cameroonian officials and "did not detail the recordkeeping practices" of those officials, leaving the agency "without any means of assessing [the information's reliability]." *Id.*

Here, the record presents no suggestion that the ICE report and Mohamed's and Henderson's statements contained within qualify as "highly unreliable." Their statements stand supported by the 2010 Mohamed statement, in which Mohamed again admitted to the fraudulent marriage. (R. at 2–6, 375–76.) In contrast to the "highly unreliable" hearsay evidence in *Djadjou*, here the report was prepared by ICE officers contemporaneous with their home visits with Henderson and Mohamed. Rather than foreign records from individuals outside of the country that could not be reviewed "to ascertain their accuracy or trustworthiness," the ICE report was a standard document prepared during an ongoing domestic law enforcement investigation. *Djadjou*, 662 F.3d at 277. Henderson's and Mohamed's statements were taken separately and on the same date; thus, each statement corroborated the other. The statements were taken around the time of their marital separation and contained admissions of fraud that directly undermined their pursuit of the Henderson petition. *See Vidinski v. Lynch*, 840 F.3d 912, 917 (7th Cir. 2016) (finding that "admissions of fraud were admissions against [former spouse's]

own penal interest, making it unlikely that she was lying" in a statement that constituted

hearsay).  As courts have found, "summaries, rather than actual affidavits or sworn testimony,

[do] not make [hearsay evidence] unreliable." *Bodo v. Mayorkas*, 2023 WL 5334606, at *7

(N.D. Ill. Aug. 18, 2023).  Thus, the ICE report does not stand so "highly unreliable" that its

inclusion in the agency's substantial and probative evidence assessment was "fundamentally

unfair" to Plaintiffs. *Cf. Ngonga v. Zanotti*, 2019 WL 1646404, at *3 (E.D. Va. Apr. 16, 2019)

(allowing agencies to rely on hearsay statements even if the interviewing officers "did not

comport themselves with the agencies' guidelines").

On its own, the ICE report may not have satisfied the substantial and probative evidence

standard. *Cf. Owusu-Boakye*, 376 F. Supp. 3d at 677 (noting that "standing alone,"

inconsistencies in former spouses' testimony and documentation "did not amount to substantial

and probative evidence of marriage fraud").  However, as the Court will address in greater detail

below, when considered in conjunction with the 2010 Mohamed statement, USCIS met its

burden to prove that it was "more than probably true that the marriage is fraudulent." *Matter of

Singh*, 27 I. & N. Dec. at 607.

Turning to the 2010 Mohamed statement, Plaintiffs assert that FDNS did not place

Mohamed under oath and he did not read the written statement's contents.  (Pls.' Mot. at 16–17.)

As Defendants note, (Defs.' Mem. at 22–23), Mohamed wrote his initials next to each answer

and signed the document, certifying under penalty of perjury that his answers were "true and

correct" and swearing that he "read and fully underst[ood] the questions and answers in [his]

sworn statement." (R. at 6, 376.)  Mohamed's actions in both initialing next to individual

answers and then signing a certification that he understood the statement's contents and swore to

their veracity directly undermine his argument. *See Seghal v. Johnson*, 105 F. Supp. 3d 860, 871

19

(N.D. Ill. 2015) (refusing to discredit a statement allegedly produced under duress when the alien spouse "signed or initialed every page, attesting that he had read and agreed with every page, and further swore that the statement was true and correct"); *see also Mukui v. Chau*, 2020 WL 3265156, at *4 (E.D. Pa. June 17, 2020) (rejecting argument that spouse did not knowingly complete a withdrawal statement that she signed, and which stated in bold letters that it was a "Request for Withdrawal of Petition for Alien Relative").  Mohamed's later affidavit that he did not understand the statement does not render USCIS's decision to rely on his sworn, signed and initialed statement arbitrary or capricious.  The agency could deem the 2010 Mohamed statement reliable and then weigh his later recantations in its credibility determinations. *See Owusu-Boakye v. Barr*, 836 F. App'x 131, 137 (4th Cir. 2020) (refusing to "re-weigh conflicting evidence" and stating that the agency properly weighed credibility questions).

Plaintiffs further contend that the 2010 Mohamed statement should not be considered proper evidence, because Mohamed later stated that he was "misled" as to the statement's purpose and only signed the document because he believed that he was participating in an undercover ICE investigation of a marriage-fraud ring.  (Pls.' Mot. at 16–17.)  In support of his argument that he acted as an ICE informant, Mohamed cites an unsigned affidavit in support of a search warrant submitted by ICE Special Agent Christopher Melia, which lists Mohamed's name in an attachment.  (R. at 308–32.)  The record also contains call logs for Mohamed's phone account, but no further explanation or evidence demonstrating his involvement in an undercover operation.  (R. at 333–58.)  Based on this limited information, the record reflects that it was neither arbitrary nor capricious for USCIS to deem the admissions of marriage fraud more credible than Mohamed's later affidavits seeking to retract his prior statements.  After all, Mohamed admitted to ICE officers in 2005, and then to FDNS in his 2010 statement, that he

entered into his marriage with Henderson to evade immigration laws.  Plaintiffs fail to show why Mohamed would admit marriage fraud on two separate occasions, five years apart, only to later recant those admissions and assert that he thought that his 2010 statement pertained to his participation in an undercover operation, with negligible evidence in the record to support such a claim.  Thus, USCIS could properly rely on the 2010 Mohamed statement and weigh its credibility against Mohamed's later affidavits.  *See Owusu-Boakye v. Barr*, 836 F. App'x at 137 ("[T]he agency weighed those credibility questions for itself, and concluded that King's 2014 admission . . . was reliable enough to be considered.").

At the heart of Plaintiffs' Motion for Summary Judgment lies their disagreement with USCIS's findings of fact and weighing of the contradictory evidence in the record.  The law does not require an agency to "mention every piece of evidence before it or every logical element of a motion." *Navarro v. Holder*, 505 F. App'x 441, 447 (6th Cir. 2012)  Rather, agencies must issue a "brief order" "in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.*; *Scourteanu v. INS*, 339 F.3d 407, 412 (6th Cir. 2003).  Here, USCIS issued such a "brief order" denying the second Smirnova petition on August 8, 2022.  (R. at 272–83.)  The order discussed the key evidence upon which the decision was based, including the 2005 ICE report and the 2010 Mohamed statement.  (R. at 273.)  The decision further discussed the Henderson and Mohamed affidavits that Plaintiffs submitted in their rebuttal of the second NOID.  (R. at 273–74.)

As courts have noted, admissions of marriage fraud play "a pivotal role in the agency's factfinding." *Owusu-Boakye*, 836 F. App'x at 137 ("Before the admission was brought before it, the BIA found insufficient evidence of marriage fraud; after it was presented with the admission, the BIA concluded that there was sufficient evidence to revoke the approval of Owusu-Boakye's

visa petition."). Here, USCIS determined that Henderson's and Mohamed's admissions in the 2005 ICE report and the 2010 Mohamed statement were more credible than their later affidavits recanting those earlier statements. The weighing of credibility questions "is a judgment left to the agency" and the Court will not "re-weigh conflicting evidence or make credibility determinations" on its own. *Id.*; *see also Gyau*, 2019 WL 1063372, at *3 (finding that the agency did not act arbitrarily or capriciously after it deemed former spouse's confession more credible when her retraction was submitted more than two years later and lacked any corroboration of her alleged coercion by officers). USCIS did not abuse its discretion in determining that Henderson's and Mohamed's affidavits, submitted more than a decade after the ICE report and more than five years after the 2010 Mohamed statement, constituted less credible evidence than the admissions of marriage fraud.

As the Fourth Circuit recently noted, "an affidavit-based recantation alone 'will generally not be sufficient to overcome evidence of marriage fraud,' especially when 'other evidence in the record supports the reliability of the admissions.'" *Mestanek*, 93 F.4th at 173 (quoting *Matter of Singh*, 27 I. & N. Dec. at 609–10.) Recantations similar to those submitted by Henderson and Mohamed have failed to rebut substantial and probative evidence of marriage fraud when a prior admission "coheres with the other evidence much more neatly than [the] recantation." *Id.* Plaintiffs may not agree with USCIS's weighing of the contradictory evidence, but the August 8, 2022 decision makes clear that the agency "did address the rebuttal evidence" even if it found that the recantations held "little to no evidentiary value." *Id.* at 174; (R. at 273–74).

"Of course, as is often true in cases in which [USCIS] determines a marriage is fraudulent, there is also evidence in the administrative record to support the opposite conclusion." *Owusu-Boakye*, 376 F. Supp. 3d at 677. However, the "possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). "[I]t is not the province of this Court to determine whether substantial and probative evidence of marriage fraud actually exists in the record." *Armah-El-Aziz v. Zanotti*, 2015 WL 4394576, at *6 (E.D. Va. July 16, 2015). Rather, the Court must only determine whether the agency "acted arbitrarily, capriciously, or not in accordance with law when it concluded that substantial and probative evidence of marriage fraud existed in the record." *Id.* Under this standard, the Court determines that USCIS did not abuse its discretion in finding substantial and probative evidence. The agency "articulated a rational, facially legitimate basis for determining that [Plaintiffs'] evidence did not outweigh the substantial evidence of marriage fraud" in finding that the ICE report and the 2010 Mohamed statement contained admissions of marriage fraud that were more credible than Henderson's and Mohamed's recantations. *Owusu-Boakye*, 376 F. Supp. 3d at 677 n.4. Further, the record reflects that USCIS reviewed and considered the affidavits even if it "assigned little weight or credibility" to the rebuttal evidence. *Id.* The agency also noted that Mohamed initialed next to each answer and signed a certification that his responses were truthful, and he fully understood their contents when he gave his 2010 sworn statement. (R. at 274.) Overall, USCIS found that Henderson's and Mohamed's admissions in the 2005 ICE report and the 2010 Mohamed statement produced substantial and probative evidence of marriage fraud and that the affidavits submitted in rebuttal did not overcome that evidence. (R. at 273–74.) The Court finds that "a reasonable factfinder could agree" with this conclusion, and therefore USCIS did not abuse its discretion. *Owusu-Boakye*, 376 F. Supp. 3d at 678.

**B.      Standard of Proof Applied to Rebuttal Evidence**

Once USCIS finds substantial and probative evidence of marriage fraud, the agency

issues the petitioner a NOID.  8 C.F.R. § 103.2(b)(8)(iv).  The NOID must "give the applicant or

petitioner adequate notice and sufficient information to respond."  *Id.*  At that point, the burden

shifts to the I-130 petitioner to rebut the finding of fraud with evidence to establish a bona fide

marriage.  *Matter of Singh*, 27 I. & N. Dec. 598, 605 (B.I.A. 2019).  The statutory and regulatory

framework does not specify a standard of proof applied to a petitioner's rebuttal evidence in the

context of an I-130 petition.  Had the agency intended to elucidate a higher burden of proof for

rebuttal evidence, as it has in other contexts, it could have done so.  *See* 8 C.F.R.

§ 204.2(a)(1)(i)(A)(1) (requiring "clear and convincing evidence" in support of a visa petition

filed on behalf of an alien by a lawful permanent resident spouse if that spouse obtained lawful

permanent resident status through a prior marriage within five years of the visa petition).

Thus, the Court assumes that the preponderance of the evidence standard applies to the

rebuttal evidence submitted in support of the second Smirnova petition.  *See Direx Israel, Ltd. v.*

*Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1991) (noting that the "preponderance

of the evidence" standard stands as the "lowest level of proof") (citing *Addington v. Texas*, 441

U.S. 418, 423–24 (1979)).  Under the preponderance of the evidence standard, the evidence must

demonstrate that the petitioner's claim appears "more likely than not" or "probably true."  *Matter*

*of Chawathe*, 25 I. & N. Dec. 369, 376 (USCIS Admin. App. Off. 2010).  This burden stands in

contrast to the higher substantial and probative evidence standard, which requires USCIS to

prove that marriage fraud is "more than probably true."  *Matter of Singh*, 27 I. & N. Dec. at 607.

Plaintiffs argue that USCIS applied the wrong standard in evaluating the rebuttal

evidence submitted in support of the second Smirnova petition.  Plaintiffs contend that Smirnova

only needed to rebut USCIS's finding of fraud by a preponderance of the evidence. (Pls.' Mot. at 20.) In requiring Smirnova to produce "irrefutable" and "unquestionable proof" that Henderson and Mohamed lived together and "indisputable proof of the genuine marital relationship," the decision applied, according to Plaintiffs, a "beyond a reasonable doubt" standard in evaluating her rebuttal evidence. (*Id.* at 22.) Plaintiffs contend that Smirnova satisfied the preponderance of the evidence standard by submitting multiple affidavits from Henderson and Mohamed, but USCIS impermissibly disregarded these as "self-serving." (*Id.* at 23.)

Defendants respond that USCIS properly considered Henderson's and Mohamed's later recantations of their earlier admissions of marriage fraud but declined to credit them in the face of those admissions. (Defs.' Mem. at 20.) Defendants also assert that USCIS did not hold Smirnova to a "beyond a reasonable doubt" standard, but rather merely required her to submit "persuasive and objective evidence of a valid marriage." (*Id.* at 24–25.) Defendants argue that the use of "unquestionable" and "indisputable" did not equate to the application of a higher evidentiary standard. (*Id.*) Even if USCIS applied the wrong standard, Defendants contend that any error was harmless. (*Id.* at 25.)

The Court disagrees with Plaintiffs and finds that USCIS applied the appropriate preponderance of the evidence standard in reviewing Plaintiffs' rebuttal evidence. In their Reply, (ECF No. 32 at 11), Plaintiffs cite to *Tocara Investments v. Johnson*, which states that "[a]n agency is not required to state the applicable burden of proof in its decision, and courts presume that an agency is aware of the law and applies the appropriate standard (unless there is a reason to think otherwise)." 2017 WL 985644, at *3 (D. Nev. Mar. 14, 2017). Thus, while USCIS did not use the phrase "preponderance of the evidence" in its August 8, 2022 decision

denying the second Smirnova petition, the Court presumes that the agency applied the appropriate standard in considering the rebuttal evidence. (R. at 272–83.) Plaintiffs focus on USCIS's use of the words "irrefutable," "unquestionable" and "indisputable" to describe Plaintiffs' inability to overcome the substantial and probative evidence of marriage fraud. (R. at 273–74.) Although the law does not require an agency "to state the applicable burden of proof in its decision," USCIS should consider the words that it uses in a decision denying an I-130 petition and avoid phrasing that may create confusion about that standard. *Tocara Investments*, 2017 WL 985644, at *3.

As Plaintiffs argue in reviewing the dictionary definitions of "irrefutable," "unquestionable" and "indisputable," such words can be suggestive of a higher burden of proof. (Pls.' Mot. at 22–23.) Nevertheless, Plaintiffs do not cite to any authority supporting the proposition that the use of such language in a decision denying an I-130 petition equates to the agency misapplying the standard of review for rebuttal evidence. The Court does not find, within the context of the entire decision and USCIS's review of the record, that these words demonstrate that USCIS in fact applied a higher burden of proof. In its decision, USCIS addressed the affidavits from Henderson and Mohamed that Plaintiffs submitted in rebuttal. (R. at 273–74.) The agency then responded to this rebuttal evidence, determining that the ICE report and 2010 Mohamed statement were more credible and that the later affidavits held "little to no evidentiary value" in its consideration of the entire record. (R. at 273–74.) The agency therefore did not believe that the recantations were "probably true" to satisfy the preponderance of the evidence standard, because the affidavits directly contradicted the admissions upon which it based its decision. *Matter of Chawathe*, 25 I. & N. Dec. at 376. Further, the Court takes note of Defendants' argument that the USCIS decision cites a series of cases in which the Board of

26

Immigration Appeals applied the proper standards of proof. (Defs.' Mem. at 25.)  It would be illogical for USCIS to cite these cases in its decision only to then misapply the appropriate standard of proof to Plaintiffs' rebuttal evidence.  Thus, the Court finds that use of the words "irrefutable," "unquestionable" and "indisputable" does not overcome the presumption that USCIS was "aware of the law and applie[d] the appropriate standard." *Tocara Investments*, 2017 WL 985644, at *3.

Even assuming that USCIS applied the incorrect standard of proof to Plaintiffs' rebuttal evidence, any error was harmless.  "Arbitrary and capricious review . . . comes with a presumption in favor of finding the agency action valid." *Avail Vapor, LLC v. FDA*, 55 F.4th 409, 419 (4th Cir. 2022).  Judicial review of agency action must take "due account . . . of the rule of prejudicial error" under the administrative law "harmless error rule." *Id.* (quoting 5 U.S.C. § 706).  The party opposing an agency decision bears the burden of establishing that an error caused harm. *Id.*  "Reversal on account of error is not automatic but requires a showing of prejudice." *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 253 (4th Cir. 2016).  The burden to demonstrate prejudicial error does not impose "a particularly onerous requirement," and "[o]ften the circumstances of the case will make clear . . . that the ruling, if erroneous, was harmful and nothing further need be said." *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009).  The harmless error rule requires "case-specific application of judgment, based upon examination of the record," and courts must consider "the likelihood that the result would have been different." *Id.* at 407, 411.

As the Court previously addressed, USCIS issued a "well-reasoned decision[] explaining the reasons, and information supporting those reasons" to find substantial and probative evidence of marriage fraud between Mohamed and Henderson. *Owusu-Boakye v. Barr*, 376 F. Supp. 3d

663, 682 (E.D. Va. 2019). While "weigh[ing] . . . credibility questions for itself," USCIS

considered Henderson's and Mohamed's affidavits submitted in rebuttal of the NOID and found

them of "little to no evidentiary value" when weighed against the earlier admissions in the ICE

report and the 2010 Mohamed statement. *Owusu-Boayke v. Barr*, 836 F. App'x 131, 137 (4th

Cir. 2020); (R. at 274). In finding Henderson's and Mohamed's admissions to constitute

substantial and probative evidence of fraud, USCIS could not also construe the affidavits, which

directly contradicted those admissions, as "probably true." Therefore, the agency determined

that, under any burden, including the preponderance of the evidence standard, the "lowest level

of proof," the affidavits and retractions did not rebut the other evidence in the record. *Direx*

*Israel, Ltd.*, 952 F.2d at 810 n.7. Accordingly, even assuming that USCIS applied the wrong

standard of proof to the rebuttal evidence, Plaintiffs would fail to show a "likelihood that the

result would have been different" under the harmless error rule. *Shinseki*, 556 U.S. at 411.

## IV.    CONCLUSION

The Court acknowledges that a "determination of marriage fraud carries great

consequences as an alien may be permanently ineligible to obtain an I-130 visa even if he

subsequently enters into a bona fide marriage with a U.S. citizen." *Osakwe v. Mukasey*, 534 F.3d

977, 979 (8th Cir. 2008) (citing 8 U.S.C. § 1154(c)). However, agency decisions "within a zone

of reasonableness" must be upheld unless "no reasonable factfinder could agree" with the

agency's factual conclusions. *Mestanek v. Jaddou*, 93 F.4th 164, 170 (4th Cir. 2024);

*Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 354 (4th Cir. 2006). USCIS conducted a

thorough review of the administrative record and issued a well-reasoned decision explaining the

substantial and probative evidence of a fraudulent marriage between Mohamed and Henderson.

Plaintiffs may disagree with the agency's credibility determination in reviewing the admissions

and rebuttal affidavits, but the Court will not "re-weigh conflicting evidence or make credibility determinations" of its own. *Owusu-Boayke v. Barr*, 836 F. App'x 131, 137 (4th Cir. 2020). Thus, the Court finds that USCIS's denial of the second Smirnova petition was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Further, the Court finds that USCIS did not apply an improper standard of proof when it reviewed Plaintiffs' rebuttal evidence and found it to hold "little to no evidentiary value" in the context of the administrative record. (R. at 274.)

For the foregoing reasons, the Court will DENY Plaintiffs' Motion for Summary Judgment (ECF No. 25), GRANT Defendants' Motion for Summary Judgment (ECF No. 27) and enter judgment in Defendants' favor.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: September 27, 2024

29